Dow W. Patten (135931)
dow@forthrightlaw.com
Gregory M. Saavedra (314915)
gregory@forthrightlaw.com
Forthright Law, P.C.
50 California Street, Suite 1500
San Francisco, CA 94111-4612
Telephone (415) 228-6848
Facsimile (415) 228-6876

Attorneys for Dr. Jordan Spatz, M.D., Ph.D., Plaintiff

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Dr. Jordan Spatz, M.D., Ph.D., | Case No.: 3:21-CV-09605-LB |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| vs. | |
| REGENTS OF THE UNIVERSITY OF CALIFORNIA; and DOES 1 to 10, inclusive, | 1. **DISCRIMINATION BASED ON AGE** 42 U.S.C. §§ 6101, *et seq.* (Age Discrimination Act of 1975) |
| Defendants. | 2. **DISCRIMINATION BASED ON AGE** Cal. Gov. Code § 12900, *et seq.* (FEHA) |
| | 3. **DISCRIMINATION BASED ON DISABILTY** Cal. Gov. Code § 12900, *et seq.* (FEHA) |
| | 4. **HARASSMENT** Cal. Gov. Code § 12900, et seq. (FEHA) |
| | 5. **RETALIATION** Cal. Gov. Code § 12900, *et seq.* (FEHA) |
| | 6. **FAILURE TO PREVENT DISCRIMINATION AND RETALIATION** Cal. Gov. Code § 12900, *et seq.* (FEHA) |
| | 7. **WHISTLEBLOWER RETALIATION** Cal. Health & Safety Code § 1278.5 |
| | **JURY TRIAL DEMANDED** |

1

Plaintiff's First Amended Complaint for Damages and Injunctive Relief
*Dr. Jordan Spatz v. Regents, et al.*                                        3:21-CV-09605-LB

Plaintiff Dr. Jordan Spatz, M.D., Ph.D. ("Plaintiff") files this Complaint, and complains of the named Defendants REGENTS OF THE UNIVERSITY OF CALIFORNIA ("Regents") and DOES 1 through 10, inclusive, (collectively, "Defendants"), and each of them, jointly and severally, and for claims, alleges as follows:

## JURISDICTION & VENUE

1.      This Court has federal question jurisdiction over this matter under the Age Discrimination Act of 1975, 42 U.S.C. §§ 6101 *et seq.*, and supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims.

2.      Venue is proper in this Court as the unlawful practices complained of occurred in the City and County of San Francisco, pursuant to 42 U.S.C. § 6104(e).

3.      This Court has personal jurisdiction over each the unlawful conduct alleged herein occurred within this judicial district.

4.      Plaintiff has been damaged in excess of the jurisdictional amount of this Court.

## INTRODUCTION

5.      This is an action for damages and injunctive relief for Age Discrimination, Disability Discrimination, Retaliation, Failure to Prevent Discrimination and Retaliation, and Whistleblower Retaliation. This action arises out of events involving Plaintiff and his education, training, and applications for residency at the The University of California at San Francisco Medical School ("UCSF") and UCSF neurological surgery residency, UCSF neurology residency, and University of California at Davis ("UCD") neurological surgery residency programs.

### The Parties

6.      Plaintiff Dr. Jordan Spatz is a thirty-eight year-old male with auditory dyslexia who was a medical student of UCSF and, in 2020 and 2021, applied to residency training at UCSF neurological survery, UCSF neurology, and UCD neurological surgery residency programs.

Plaintiff's First Amended Complaint for Damages and Injunctive Relief
*Dr. Jordan Spatz v. Regents, et al.*                                                    3:21-CV-09605-LB

7.      Defendant Regents constitute the governing board for the University of California. Regents is treated as the real party in interest in all legal actions involving the University for all purposes under California law.

8.      Regents is an employer within the meaning of the California Fair Employment and Housing Act ("FEHA") because it regularly employs in excess of five employees.

9.      On information and belief, at all times herein mentioned, Defendants were and are the recipients of Graduate Medical Education funding issued by the Centers for Medicare and Medicaid Services. On information and belief, on or about June 28, 1993 Regents executed the Assurance of Compliance with the Department of Health and Human Services Regulation under the Age Discrimination Act of 1975. This Assurance of Compliance is an unambiguous waiver of Regents' Eleventh Amendment sovereign immunity pursuant to 42 U.S.C. § 2000d-7.

10.      Regents is an arm of the state of California. At all times herein mentioned, Defendants were and are entities of the State of California, and at all relevant times herein, Plaintiff's educator and prospective employer. Based on information and belief, Defendants are headquartered in the County of Alameda.

11.      Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1–10, inclusive, and Plaintiff therefore sues such defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of these fictitiously named defendants is responsible in some manner for the occurrences, acts, and omissions alleged herein and that Plaintiff's injuries as alleged herein were proximately caused by such aforementioned defendants.

12.      Plaintiff is informed and believes, and therefore alleges, that at all times mentioned herein Defendants were the agents, servants, employees and/or joint venturers of the other Defendants and were, as such, at all times mentioned acting within the scope, course and authority of this agency, employment and/or joint venture. Plaintiff is further informed and believes and, therefore alleges, that each of the Defendants consented to, ratified, participated in, or authorized the acts of the remaining defendants. Plaintiff will amend this Complaint to allege

their true names and capacities when ascertained.

## FACTS COMMON TO ALL CLAIMS

Academic Background

13.     Plaintiff Dr. Jordan Spatz, M.D., Ph.D. was a medical student at UCSF pursuing a career in medicine with a specialization in neurological surgery. Plaintiff was conferred with a Doctor of Medicine with Distinction by UCSF in September 2021.

14.     Plaintiff has a lifelong learning disability. In the first grade, Plaintiff was diagnosed with auditory dyslexia and speech impairments arising from an inner ear condition. Plaintiff has undergone multiple ear tubes and surgeries, including otoplasty surgery at age twelve and additional surgeries as an adult. Through middle school, Plaintiff received intensive speech therapy. Special education services continued through high school. Plaintiff has been granted disability accommodations for academic and clinical duties throughout undergraduate and graduate school, medical school, and by the National Board of Medical Examiners ("NBME") for all written and clinical examinations. Plaintiff has learned to apply himself diligently to his studies.

15.     Plaintiff graduated in 2005 from The University of Colorado at Boulder with Bachelor and Master of Science degrees, and a Minor degree. Plaintiff's Bachelor of Science is conferred magna cum laude.

16.     Plaintiff's education continued at Massachusetts Institute of Technology, where in 2015 he was conferred with a Ph.D. by the Harvard-MIT Program in Health Sciences and Technology. His academic achievements are summarized with a cumulative grade point average of 4.9 (out of 5.0) alongside his earning of over one million dollars in grants funding, multiple completed spaceflight experiments, U.S. Government Secret clearance (2006–2013), multiple awards from U.S. Consulate General, the Government of Thailand, and M.I.T. for international non-profit work that built a preschool and improved water quality for a village in northern Thailand (2009–2015), and multiple fellowships including 2013–2014 Hugh Hampton Young Fellow, and U.S. Department of Energy and U.S. Department of Army Fellowship (2014–2015).

17.     Plaintiff pursued a Doctor of Medicine degree at UCSF, enrolling in August 2015. UCSF has consistently been highly-ranked globally for clinical medicine and pharmacy in the Academic Ranking of World Universities. Plaintiff engaged with the UCSF community as Founder and Co-President of the UCSF Aerospace Medicine Interest Group, and served as Vice President of the UCSF Medical Student Chapter of the American Association of Neurological Surgeons from 2017 through 2018. As a researcher, Plaintiff has had over twenty peer-reviewed medical publications, including more than eight first-author publications. Plaintiff held the Northrop Grumman Health Division Ph.D. fellowship from 2015 through 2020, and also held the UCSF Neurosurgery Research Foundation Fellowship in 2018. Plaintiff's enrollment at UCSF is not merely the culmination of a lifetime of academic achievement, but a paving stone on his path of continued success.

18.     Plaintiff extended their medical education to conduct clinical & translational research.

19.     From June 2018 to June 2019, as part of UCSF Resource Allocation Program for Trainees, Plaintiff received a competitive merit award and extended his education to join the Dr. Manish Aghi Laboratory in a year-long inquiry into glioblastoma immunotherapy. This lead to an industry collaborative funding agreement, the creation of novel intellectual property, and a resulting publication.

20.     UCSF recognizes students who take part in extended research by conferring the degree of Doctor of Medicine with Distinction. As a result, Plaintiff was conferred with a Doctor of Medicine with Distinction in September 2021.

21.     Records of achievement and recommendation are collected in a Medical Student Performance Evaluation ("MSPE"). Plaintiff's MSPE indicates a grade of Pass for all courses, and a grade of Honors for six courses in Neurological Surgery and Neurology. Per UCSF policy, "An honors grade may only be awarded for coursework supervised by UCSF Faculty and is only awarded for student performance that is measurably outstanding."

22.     On information and belief, for the Class of 2021 and future graduating classes, UCSF has removed Honor grades for all core clerkships, rendering them Pass/Fail only.

Additionally, UCSF policy is to grade "away" rotations as Pass/Fail only. On information and belief, Plaintiff's numerical scores for Neurological Surgery "away" rotations would qualify for Honors if not for UCSF's policy.

23.     On information and belief, Plaintiff has completed more cumulative Neurological Surgery subinternship months than any other UCSF graduating student in either 2020 or 2021.

Residency: An Essential Step to Licensure

24.     After a medical degree (M.D.) is conferred, prospective medical practitioners must complete a period of Graduate Medical Education under the supervision of a senior medical clinician to obtain a license to practice medicine and, in particular, a license to practice a chosen speciality. This period of training is known as "residency." On information and belief, residencies in Plaintiff's applied-to specialties, Neurological Surgery and Neurology, have a duration of 4–7 years. On information and belief, residents in those fields earn an average salary of $63,400.

25.     Residency is regulated by the National Resident Matching Program, a non-governmental organization that organizes an annual program to fill residency vacancies (the "Match"). In Match, a residency candidate selects, by rank, vacancies at participating entities across the nation. Similarly, participating entities select, by rank, candidates for the vacancies they have. The Match algorithm requires mutual selection between candidates and participating entities; placement is decided by "matching" the rank that the participating entity gives to a candidate with the rank that the candidate gives to a participating entity.

26.     Candidates that are not placed with a residency program by the Match may participate in the Supplemental Offer and Acceptance Program ("SOAP"). In SOAP, applicants may apply to up to 45 positions.

27.     As part of the Association of American Medical Colleges residency application form, Plaintiff entered his birthdate. On information and belief, birthdate is included among the information shared with participating entities as part of the Match and SOAP processes.

28.     On information and belief, in 2020, 93.7% of graduating U.S. M.D. senior medical students were selected for residency via the Match and SOAP; in 2021, 92.8% of

1    graduating U.S. M.D. senior medical students were selected for positions via the Match and

2    SOAP.

3           29.    UCSF conducts Graduate Medical Education including Neurological Surgery and

4    Neurology residency programs. In 2019 Plaintiff ranked UCSF Neurological Surgery such that,

5    if UCSF Neurological Surgery ranked Plaintiff, they would have Matched. Plaintiff did not apply

6    to or rank UCSF Neurology or UCD Neurological Surgery in 2019. In 2020 Plaintiff ranked

7    UCSF Neurological Surgery and UCD Neurological Surgery such that, if either residency ranked

8    Plaintiff, they would have Matched. Plaintiff did not apply to or rank RESIDENCY 2 in 2020. In

9    2021 Plaintiff ranked UCSF Neurological Surgery, UCSF Neurology, and UCD Neurological

10   Surgery such that, if any residency ranked Plaintiff, they would have Matched.

11

12                   Plaintiff Encounters Adversity at MEDICAL SCHOOL

13          30.    Dr. Spatz' academic and professional excellence is distinguished in part because

14   of its breadth. Plaintiff's education and inclination caused him to pursue a specialization in

15   Neurological Surgery among the team at UCSF. Because Plaintiff engaged in extra-academic

16   employment, fellowships, and research, the time it took for Plaintiff to advance through the

17   academic process was accordingly longer.

18          31.    In 2017, Plaintiff first faced discrimination regarding his age and disability at

19   UCSF. In October 2017, Dr. Spatz was told by a senior resident that he had to ask questions

20   differently because he was "older" and exhibited a dyslexic speech pattern. In November 2017,

21   Plaintiff made a complaint to the UCSF Office for Prevention of Harassment and Discrimination

22   ("OPHD") about that conduct. OPHD conducted an investigation and an intervention was

23   performed with the resident.

24          32.    On or about March 5, 2018, Dr. Andre Campbell, M.D., FACS, FACP, FCCM

25   (Professor of Surgery, Division of General Surgery; Vice Chair for Diversity, Equity, and

26   Inclusion; Director, UCSF Surgical Critical Care Fellowship, UCSF School of Medicine) ("Dr.

27   Campbell") who, as Course Director, addressed a group of more than twenty medical students at

28   a third-year clerkship orientation. Among the group, Dr. Campbell singled out Dr. Spatz:

1  "Jordan is old as shit and won't be able to take overnight call."

2      33.    Plaintiff reported this incident to Dean Leon "Lee" Jones, M.D. (Associate Dean

3  of Students, School of Medicine (at the times mentioned in the Complaint)) ("Dean Jones") in-

4  person on the same day. Dean Jones represented that Dr. Campbell would be spoken-to after the

5  clerkship. Dean Jones advised Plaintiff to not make a report with the OPHD because Plaintiff

6  was interested in Neurological Surgery—stating that such reports could subject Plaintiff to

7  retaliation within the residency ranking process in that competitive specialization.

8      34.    On or about October 1, 2019, Plaintiff applied for UCSF Neurological Surgery

9  residency and Neurological Surgery residencies at other locations.

10      35.    On or about January 9, 2020, Plaintiff was interviewed by Dr. Praveen

11  Mummaneni, M.D. (Professor and Vice-chairman, UCSF Weill Institute for Neurosciences)

12  ("Dr. Mummaneni") as part of his application for UCSF Neurological Surgery residency. During

13  that interview, Dr. Mummaneni told Plaintiff that he was "an older applicant" and asked Plaintiff

14  to "justify why you won't burn out in 3–4 years to go into investment banking." Dr. Mummaneni

15  continued with questions regarding 80-hour duty requirements for residents immediately after

16  addressing Plaintiff's age and the topic of "burn out." Plaintiff replied that he would work the

17  "maximum 80-hour" requirement. It is well-known throughout UCSF that residents were

18  expected to regularly exceed hourly limits in violation of rules set by the Accreditation Council

19  for Graduate Medical Education.

20      36.    On or about January 10, 2020, Plaintiff met with Dr. Manish Aghi, M.D., Ph.D.,

21  MAS (Professor, Neurological Surgery, UCSF Weill Institute for Neurosciences) ("Dr. Aghi")

22  as part of his application for UCSF Neurological Surgery. During that meeting, Dr. Aghi inferred

23  that age is used in resident selection decisions for UCSF's Neurological Surgery residency: "it's

24  going to be a tough year for M.D.-Ph.D. Applicants." On information and belief, studying for

25  and receiving an M.D. concurrently to a Ph.D. requires more time that pursuing only a Ph.D., so

26  M.D.-Ph.D. applicants are accordingly and generally older. Dr. Aghi clarified that Dr. Philip

27  Theodosopoulos, M.D. (Residency Program Director, UCSF Weill Institute for Neurosciences)

28  ("Dr. Theodosopoulos") "doesn't want to train M.D.-Ph.D.s."

37.     On or about January 14, 2020, Plaintiff met with Dr. Mitchel Berger, M.D. (Chair, UCSF Weill Institute for Neurosciences) ("Dr. Berger") as part of his application for UCSF Neurological Surgery residency. When Dr. Spatz entered Dr. Berger's office, Dr. Berger immediately stated "well, you're only going to have a 25-year career in neurological surgery."

38.     The pattern of three senior leaders of UCSF and Neurological Surgery uniformly and unequivocally addressing Plaintiff's age in connection with residency selection decision so disturbed Plaintiff that, on the same day of meeting Dr. Berger, he emailed Dean Jones to request a phone conversation regarding age discrimination within UCSF Neurgological Surgery residency selection.

39.     On or about January 15, 2020, Dr. Spatz and Dean Jones spoke by telephone. Dean Jones again counseled Plaintiff about the risk of retaliation if he was to make a report with the OPHD. Dean Jones specifically mentioned retaliation by Dr. Berger who, as Chair, had ready access to influence the selection decisions of other residencies to which Plaintiff had applied and ranked. Dean Jones told Plaintiff to delay any complaint until after the Match because UCSF could not prevent Dr. Berger from speaking poorly of Plaintiff concerning residency selection.

40.     On or about February 6, 2020, Dr. Sigurd Berven, M.D. (Professor, Orthopaedic Surgery) told Dr. Spatz that, earlier that day, they had spoke with Dr. Mummaneni on their way to the resident rank selection meeting. They discussed Dr. Spatz' age, "burn out," and Dr. Spatz' statements regarding the "maximum 80-hour" work week.

41.     At 8:30 p.m. the same day, Dr. Spatz received a call from an audibly upset Dr. Aghi. Dr. Aghi stated that Dr. Spatz' age was openly discussed and formally considered at the UCSF Neurological Surgery residency rank selection meeting.

42.     In that same call, Dr. Aghi also informed Dr. Spatz that Dr. Berger spoke with the Chair of Neurological Surgery at Duke University, another school to which Plaintiff had ranked for residency. In that conversation, Dr. Berger made disparaging statements about Dr. Spatz to his Duke counterpart. On information and belief, it is likely that UCSF personnel have made similar statements to decision-making staff at other universities that Dr. Spatz interviewed with and/or ranked for residency.

43.     On February 9, 2020, Dr. Aghi confirmed via text message that the committee formally considered age in their selection decision:

> "So they [at UCSF Neurosugery residency program selection rank meeting] discussed the age of this kid [...] from Pitt but everyone felt like he was a bundle of energy and no concerns that he would be too old, in your case there were concerns that you might not have the stomach for the pace of our program. It is pretty brutal and the good [subinterns] are constantly on the move without stopping."

44.     Based on these events, on or about February 12, 2020, Plaintiff met in person with Dean John Davis, Ph.D., M.D. (Associate Dean for Curriculum, UCSF School of Medicine) ("Dean Davis") to report of discrimination and harassment as a UCSF student and in the residency selection process. Dean Davis apologized, and recommended not filing a written complaint until after March 20, 2020—the Match date for residency selection—citing the risk of retaliatory action by faculty and staff of UCSF.

45.     On February 14, 2020, Dr. Spatz met with Dr. Aghi. Dr. Aghi stated, "I can call my contacts at other Nerological Surgery residency programs you've applied and tell them since we need to hire female residents for diversity, and we won't be taking you, that you're interested in their program." As the conversation continued, Dr. Aghi reiterated that statements about Dr. Spatz' age and "slowness" were discussed during the evaluation of residency applications for UCSF Neurological Surgery residency.

46.     February 20, 2020 was the Due Date for the National Residency Rank List: when all candidates and participating entities must submit their ranked choices to the National Resident Matching Program to calculate the annual Match. In the Operating Room that day, Dr. Berven mentioned to Plaintiff that he and Dr. Mummaneni had spoke regarding "concerns about you burning out of residency" and they had observed that "as an older applicant, you have a more laid back personality."

47.     The same day, Dr. Spatz reported this interaction to Dean Jones in-person. Dean Jones noted that "the intensity of discrimination and harassment clearly picked up in context of today being the rank list submission" and apologized that this was occurring at UCSF.

48.     On February 21, 2020, Dr. Spatz was scrubbed into a sterile operating room for a morning case meeting with Dr. Andrew Chan, M.D. (Chief Resident, Neurological Surgery UCSF Weill Institute for Neurosciences (at the times mentioned in the Complaint)) ("Dr. Chan") and Dr. Sanjay Dhall, M.D. (Associate Professor, Neurology UCSF Weill Institute for Neurosciences (at the times mentioned in the Complaint)) ("Dr. Dhall"). The following interaction occurred:

> Dr. Dhall asked, "have either of you seen *Forrest Gump*?"
> Plaintiff replied, "I've seen it."
> Dr. Chan noted, "you know Jordan [Spatz] is 40."
> Plaintiff responded, "I'm thirty-six."
> Dr. Chan continued, "like it makes any difference."
> Dr. Dhall observed, "so, when you're done with residency, they can roll
> you right into the nursing home."

49.     On or about March 16, 2020, Plaintiff learned that he did not match with a residency program. Plaintiff participated in the Supplemental Offer and Acceptance Program (SOAP), applying to the maximum of 45 positions including all local unfilled surgical positions listed by UCSF. Plaintiff was ultimately not selected for any of these positions. On information and belief, UCSF selected other, less-qualified and/or less-experienced candidates for these positions.

50.     On or about March 17, 2020, Plaintiff spoke with Dr. Campbell regarding general surgery positions at UCSF, and nationally, through SOAP. Dr. Campbell is assigned by UCSF to coordinate with students regarding SOAP surgery positions. During their conversation, Dr. Campbell asked Dr. Spatz to state his age. Dr. Campbell, mirroring his statements in 2018, then stated "well, that's a problem because they got to believe you'll make it through 6–7 years of the hard grind." Dr. Campbell's statements show that Plaintiff's age was foundational to UCSFs' evaluation process for residency positions.

51.     On or about March 18, 2020, Mr. Grant Abernathy, MPA (Senior Complaint Resolution Officer, UCSF Office of Diversity and Outreach) called Dr. Spatz to state that the OPHD would investigate some of his claims filed on February 9, 2020—however, the OPHD would not investigate any of Dr. Spatz' claims insofar as they related to age, and denied the

1 applicability of any age discrimination law to Plaintiff's education, training, or employment. In

2 October 2020, Dr. Spatz received a Notice of Formal Investigation from the OPHD that, once

3 again, did not include investigations into Plaintiff's allegations of age discrimination.

Discrimination in 2020 Continued to Affect 2021

4

5      52.    In preparation for a successful residency application in 2021, Dr. Spatz spoke

6 with with two representatives at UCSF: on or about July 30, 2020 with Dr. Megan Richie, M.D.

7 (Assistant Professor, Neurology Medical Student Clerkship, UCSF Weill Institute for

8 Neurosciences); and on or about September 11, 2020 with Dr. S. Andrew Josephson, M.D.

9 (Chair, Neurology, UCSF Weill Institute for Neurosciences). Both discussed with Plaintiff a plan

10 to apply to two fields in the 2021 Match: Neurological Surgery, and Neurology. On information

11 and belief, Neurology is a less-competitive specialty than Neurological Surgery and has

12 comparably more annual residency vacancies at UCSF and nationally.

13      53.    In 2020, Dr. Ramin Morshed ("Dr. Morshed") was Plaintiff's supervising resident

14 at San Francisco General Hospital. As a result of protected activities by Dr. Spatz, Dr. Morshed

15 was twice investigated by UCSF for comments made regarding national origin and denial of

16 access to common educational spaces. On information and belief, after those investigations were

17 initiated, Dr. Morshed made negative references to Dr. Spatz' age and disability.

18      54.    While Dr. Morshed was under investigation, UCSF selected Dr. Morshed to be a

19 UCSF Neurological Surgery Residency chief resident for the upcoming year (2021). As UCSF

20 Neurological Surgery Residency's prospective 2021 chief resident, Dr. Morshed interviewed Dr.

21 Spatz for UCSF Neurological Surgery Residency. In January 2021, Plaintiff observed Dr.

22 Morshed to provide residency selection input to Dr. Aghi specifically with regards to selection

23 for UCSF Neurological Surgery Residency. Although Dr. Morshed did not have ultimate

24 authority to rank residency candidates, UCSF did not remove Dr. Morshed from the selection

25 process. Dr. Morshed's participation permitted his discriminatory and retaliatory animus to play

26 a part in the selection process, resulting in an adverse action to Plaintiff.

27      55.    On or about December 8, 2020, Plaintiff interviewed with UCD Neurological

28 Surgery Residency as part of his 2021 application for residency. The interviewer, Dr. Ben

Waldau, M.D., F.A.A.N.S. (Associate Professor, Neurological Surgery, U.C. Davis) told Dr.
Spatz regarding his application, "we obviously don't want someone that has migraines on-call."
On information and belief, a letter of recommendation from UCSF stated that Plaintiff suffered
from migraines, but also that those migraines were fully resolved with medications.

56.     On or about March 15, 2021, Dr. Spatz learned that he did not Match with any
residency program for the second year in a row. Plaintiff again applied for the maximum 45
positions through SOAP, including all local unfilled surgical positions listed by UCSF. Plaintiff
was not selected for any of these positions. On information and belief, UCSF selected other,
less-qualified and/or less-experienced candidates for these positions. On information and belief,
without Plaintiff's knowledge, UCSF staff disclosed to participating entities during 2021 Match
and SOAP that Plaintiff applied to residency vacancies for both Neurological Surgery and
Neurology. On information and belief, such a disclosure is material to selection because
participating entities consider exclusive interest in a specialty to be critical to their selection of
residents.

57.     On or about March 19, 2021, Dr. Spatz was contacted by Dr. Philip Starr, M.D.,
Ph.D. (Chair, Neurological Surgery, UCSF Weill Institute for Neurosciences) ("Dr. Starr"), who
oversaw UCSF Neurological Surgery trainees in 2020 including Plaintiff. During a virtual
meeting, Dr. Starr told Plaintiff that he had refused to select Plaintiff for UCSF Neurological
Surgery Residency.

58.     During that virtual meeting, Dr. Starr made comments reflecting age and
disability stereotypes. Dr. Starr framed his refusal to select as "you have a higher risk of killing a
patient than others" and "your capacity to work long hours is not good enough to be a resident."
Dr. Spatz inquired as to what made him differently-qualified from other fully-trained medical
students; Dr. Starr repeated, "just based on my experience of training many residents you are a
higher risk of resulting in the death of patients," and refused, when asked, to provide specific
examples. Dr. Starr's 2021 comments contrast his evaluation of Plaintiff for a 2018 clinical
clerkship, where he wrote: "Jordan [Spatz] was thorough and very personable with the patients.
He had a good bedside manner. Jordan took on a project to improve intraoperative targeting

13

Plaintiff's First Amended Complaint for Damages and Injunctive Relief
*Dr. Jordan Spatz v. Regents, et al.*                                                          3:21-CV-09605-LB

accuracy. Keep up the good work!"

59.     On or about March 25, 2021, Plaintiff took part in a remote conversation with Dean Catherine R. Lucey, M.D. (Vice Dean for Education, UCSF School of Medicine) ("Dean Lucey") and Dean Jones. The goal of the meeting was for Dr. Spatz to extend graduation to May 2022 to afford clinical opportunities necessary to be eligible to apply into alternative medical specialties. During the meeting, Dean Lucey stated she had a recent conversations with Dr. Edward Chang, M.D. (Chairman, Neurological Surgery, UCSF Weill Institute for Neurosciences) and Dr. Starr regarding concerns about Dr. Spatz' "durability for a neurological surgery residency." The term "durability" references Dr. Spatz' age, relative to stereotypical medical residents, and how it was used by decision-makers to determine his ability to perform during a years-long residency program.

60.     Dean Lucey characterized Dr. Starr's statements as "a lot of times people say things they shouldn't say."

61.     The March 25 conversation also extended to Plaintiff's disability. When discussing residency possibilities, Dean Lucey told Dr. Spatz that "UCSF was aware of your disability accommodations, and they may not be appropriate for residency."

<u>MEDICAL SCHOOL Did Not Select Plaintiff for Residency Because of his Age, Disability, and Engagement in Protected Activities.</u>

62.     Because of Dr. Spatz' age, disability, and engagement in protected activities, current and former members of the UCSF violated NRMP and UCSF Policies concerning residency rank and selection to ensure Plaintiff would not be ranked or selected for any residency that would further his career in medicine. The consistency over two years among faculty and staff at UCSF in their statements and actions toward Dr. Spatz indicate that discrimination against age and disability are a pattern and practice of UCSF.

63.     On or about December 14, 2020 and April 1, 2021, Plaintiff obtained Rights to Sue from the California Department of Fair Employment and Housing and has hereby exhausted his administrative remedies with respect to the FEHA.

14

Plaintiff's First Amended Complaint for Damages and Injunctive Relief
*Dr. Jordan Spatz v. Regents, et al.*                                          3:21-CV-09605-LB

64.     On or about March 25, 2021, Plaintiff filed an administrative complaint of Age Discrimination to U.S. Department of Health and Human Services Office for Civil Rights ("HHS OCR") pursuant to 45 C.F.R. Part 90. Dr. Spatz' written administrative complaint included detailed allegations of facts indicating Dr. Spatz suffered discrimination on the basis on age including: when called "older" by a senior medicine service resident in 2017, and the subsequent OPHD investigation (*supra*, ¶ 31); when called "old as shit" in 2018 (*supra*, ¶ 32–33); when called "an older applicant" on or about January 9, 2020 (*supra*, ¶ 35); learning that M.D.-Ph.D. applicants, who are older, are disfavored in the residency selection process on or about January 10, 2020 (*supra*, ¶ 36); when the Chair of UCSF Neurological Surgery residency noted "you're only going to have a 25-year career in Neurosurgery" on or about January 14, 2020 (*supra*, ¶ 37– 38); Dean Jones' recommendation to not immediately file a complaint with OPHD on or about January 15, 2020 (*supra*, ¶ 39); when Plaintiff was informed by Drs. Berven and Aghi that age was discussed at the resident rank selection meeting and disparaging comments were made to a third party, on or about February 6, 2020 (*supra*, ¶ 40–43); when Dean Davis recommended not filing a complaint on or about February 12, 2020 (*supra*, ¶ 44); Dr. Aghi's statements about age and "slowness" on or about February 14, 2020 (*supra*, ¶ 45); observations made by Drs. Berven and Mummaneni about Plaintiff being "an older applicant" on or about February 20, 2020 (*supra*, ¶ 46); Plaintiff's report to Dean Jones on or about February 20, 2020 (*supra*, ¶ 47); the operating room case meeting where Plaintiff was identified as 40 years of age (*supra*, ¶ 48); Plaintiff's failure to match on or about March 16, 2020 (*supra*, ¶ 49); Plaintiff's being asked his age by a decision-maker for UCSF general surgery residencies on or about March 17, 2020 (*supra*, ¶ 50); Plaintiff's communications with OPHD from March–October 2020 (*supra*, ¶ 51); Plaintiff's meeting regarding applications to Neurological Surgery and Neurology in the next match on or about July 30 and September 11, 2020 (*supra*, ¶ 52); Dr. Morshed's statements about Plaintiff's age and disability in 2020 and 2021 (*supra*, ¶ 53–54); Plaintiff's history of migraines (*supra*, ¶ 55); Plaintiff's failure to match in 2021 (*supra*, ¶ 56); Dr. Starr's refusal to select Plaintiff to match in 2021 (*supra*, ¶ 57–58); Dean Lucey's and Dean Jones' observations about Plaintiff's "durability" as a reference to his age on or about March 25, 2021 (*supra*, ¶ 59–

60). On or about March 30, 2021, Plaintiff received an automated response indicating that HHS OCR had received the filing.

65.     On or about April 28, 2021, HHS OCR interviewed Dr. Spatz. During that call, the HHS OCR representative and Plaintiff reviewed the entirety of Plaintiff's written complaint, including incidents that occurred more than 180 days before Plaintiff filed the complaint with HHS OCR ("pre-180-day incidents"). Subsequently, the HHS OCR representative notified Plaintiff that based on the complaint and its ongoing nature, HHS would not exclude pre-180-day incidents from its investigation.

66.     On or about September 10, 2021, HHS OCR sent a letter to Dr. Spatz indicating that the complaint was received on March 26, 2021, and that HHS OCR was investigating the incidents in the written complaint, excluding nothing in the investigation of Plaintiff's Age Discrimination Act of 1975 complaint. This letter specifically mentioned incidents that occurred more than 180 days before Plaintiff filed the complaint.  Plaintiff thereby exhausted his administrative remedies with respect to the Age Discrimination Act of 1975, and the investigating agency (HHS OCR) extended the temporal scope of its investigation beyond 180 days prior to the filing of the complaint.

## FIRST CLAIM

### Age Discrimination in Violation of the 1975 Act

(Alleged Against Defendant Regents and Does 1-5)

67.     Plaintiff re-alleges, as though fully set forth herein, the factual allegations in paragraphs 1 through 66 set forth above.

68.     The Age Discrimination Act of 1975, 42 U.S.C. §§ 6101 *et seq.*, prohibits exclusion from participation and discrimination on the basis of age in programs or activities receiving federal financial assistance. 42 U.S.C. § 6102 states ". . . no person in the United States shall, on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance."

69.     On or about March 25, 2021, Plaintiff filed an administrative complaint of Age

Discrimination to HHS OCR. On or about April 28, 2021, HHS OCR extended the requirement that a complaint be filed within 180 days from the date the complainant first had knowledge of the discrimination, pursuant to its interpretation of 45 C.F.R. § 91.42. HHS OCR accepted Plaintiff's claim on or about September 10, 2021, and in that letter noted that it was investigating allegations that occurred more than 180 days preceding Plaintiff's filing.

70.     Upon information and belief, HHS OCR continues to investigate Plaintiff's claims and has not made any findings. On or about April 29, 2021, HHS OCR referred Plaintiff's complaint to the Federal mediation and Conciliation Service pursuant to 45 C.F.R. § 91.43; FMCS mediation took place on July 9, 2021. September 22, 2021 marked 180 days following Plaintiff's filing of the administrative complaint; therefore, on and after that date, the administrative remedies requirement defined by 42 U.S.C. § 6104(f) was exhausted.

71.     Plaintiff duly provided notice via Registered Mail to the Secretary of Health and Human Services (October 25, 2020), the Attorney General of the United States (October 26, 2020), and the Regents of the University of California (October 8, 2020), receipt of which has been confirmed, fulfilling the notice requirements of 42 U.S.C. § 6104(e).

72.     This action was commenced more than thirty (30) days thereafter, when the Complaint was filed on December 13, 2021. Therefore, Plaintiff  duly exhausted his administrative remedies.

73.     At all times relevant, Plaintiff was older in age than his peers.

74.     Plaintiff was otherwise qualified to perform the tasks expected of a resident in the fields of Neurological Surgery, Neurology, emergency medicine, and general surgery.

75.     Plaintiff was subjected to discrimination because of his age.

76.     The Regents acted with discriminatory intent because the actors knew of Plaintiff's age when they did not select Plaintiff for residency, and, on information and belief, UCSF School of Medicine staff informed other institutions of Plaintiff's disability.

77.     Regents regarded Plaintiff as old within the meaning of the Age Discrimination Act of 1975 at the times Regents failed to select Plaintiff for residency.

78.     As a direct result of the acts and conduct of Defendants as alleged herein, Plaintiff

was unlawfully denied educational opportunities and is thereby entitled to relief enjoining Defendants from continuing to deny Plaintiff educational opportunities.

79.     The conduct of Defendants described herein above was outrageous and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff.

80.     Defendants committed the acts alleged herein by acting knowingly and willfully, with the wrongful and illegal deliberate intention of injuring Plaintiff, from improper motives amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to injunctive relief and attorneys' fees in amounts according to proof at time of trial, in addition to any other remedies and damages allowable by law.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

## SECOND CLAIM

### Age Discrimination in Violation of the FEHA

(Alleged Against Defendant Regents and Does 1-5)

81.     Plaintiff re-alleges, as though fully set forth herein, the factual allegations in paragraphs 1 through 80 set forth above.

82.     Under the FEHA, it is unlawful "[f]or an employer,...because of...age...to discriminate against [an employee]...in terms, conditions, or privileges of employment." Cal. Gov. Code § 12940(a). "'Age,'" within the meaning of the FEHA, "refers to the chronological age of any individual who has reached a 40th birthday" and "includes a perception that the person has any of those characteristics." Cal. Gov. Code § 12926, subds. (b), (o).

83.     Plaintiff is part of a protected class under the California Fair Employment and Housing Act: he was generally perceived to be at or over the age of 40 by relevant decision-makers.

84.     In addition to being perceived as having reached his 40th birthday, Plaintiff is also part of a protected class because he sought education, training, and employment for a fixed term of 4–7 years during which Plaintiff would have reached his 40th birthday.

85.     This is a case of first impression, brought as a good-faith extension of existing

law. No case has, on information and belief, been brought under the FEHA wherein a Plaintiff under the age of 40 has sought education, training, and employment for a fixed period of time during which Plaintiff will reach their 40th birthday.

86.     Defendants took adverse education, training, and employment action by failing to select Plaintiff based on imputations of Plaintiff's abilities vis a vis his perceived age. Defendants also took adverse employment action by making representations about Plaintiff's age to third parties for the purpose of eliminating his ability to be trained within Neurological Surgery.

87.     Plaintiff's protected class (perceived age; actual age over the course of a fixed term of education, training, and employment) was a substantial motivating factor in the decisions to engage in the adverse actions set forth above.

88.     As a direct result of the acts and conduct of Defendants as alleged herein, Plaintiff has suffered a loss of earnings and related benefits in an amount to be proven at trial herein.

89.     As a direct and proximate result of the willful, knowing, discrimination, Plaintiff has suffered depression, mental distress, anguish, and indignation. He is thereby entitled to general and compensatory damages in an amount to be proven at trial.

90.     The conduct of Defendants described herein above was outrageous and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff.

91.     Defendants committed the acts alleged herein by acting knowingly and willfully, with the wrongful and illegal deliberate intention of injuring Plaintiff, from improper motives amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover nominal, actual, and compensatory damages an attorneys' fees in amounts according to proof at time of trial, in addition to any other remedies and damages allowable by law.

92.     As pleaded above, Plaintiff has duly exhausted his administrative remedies. WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

### THIRD CLAIM

<u>Disability Discrimination in Violation of the FEHA</u>

(Alleged Against Defendant Regents and Does 1-5)

93.     Plaintiff re-alleges, as though fully set forth herein, the factual allegations in paragraphs 1 through 92 set forth above.

94.     Under the FEHA, it is unlawful "[f]or an employer,...because of...mental disability...to discriminate against [an employee]...in terms, conditions, or privileges of employment." Cal. Gov. Code § 12940(a). A "'[m]ental disability'" within the meaning of the FEHA includes "any mental or psychological disorder..., such as...emotional or mental illness...that limits a major life activity." Cal. Gov. Code § 12926(j)(1). The term "'[m]ajor life activities'" is "broadly construed and includes physical, mental, and social activities and working" (id., subd. (j)(1)(C)); "limits" means the achievement of a major life activity is made difficult. Id., subd. (j)(1)(A) & (B))

95.     At all times relevant, Plaintiff suffered and suffers from a disability: dyslexia.

96.     Plaintiff was otherwise qualified to do the job with or without reasonable accommodation.

97.     Plaintiff was subjected to an adverse employment action because of the disability.

98.     The Regents acted with discriminatory intent, as UCSF knew of Plaintiff's disability when they did not select Plaintiff for residency, and when, through Dr. Berger, acting in his role as Chair, they informed other institutions of Plaintiff's disability.

99.     Regents regarded Plaintiff as disabled within the meaning of the FEHA at the time of each adverse employment action.

100.    As a direct result of the acts and conduct of Defendants as alleged herein, Plaintiff has suffered a loss of earnings and related employment benefits in an amount to be proven at trial herein.

101.    As a direct and proximate result of the willful, knowing, discrimination, Plaintiff has suffered depression, mental distress, anguish, and indignation. He is thereby entitled to general and compensatory damages in an amount to be proven at trial.

102.    The conduct of Defendants described herein above was outrageous and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff.

103.    Defendants committed the acts alleged herein by acting knowingly and willfully, with the wrongful and illegal deliberate intention of injuring Plaintiff, from improper motives amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover nominal, actual, and compensatory damages an attorneys' fees in amounts according to proof at time of trial, in addition to any other remedies and damages allowable by law.

104.    As pleaded above, Plaintiff has duly exhausted his administrative remedies. WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

### FOURTH CLAIM

Harassment in Violation of the FEHA

(Alleged Against Defendant Regents and Does 1-10)

105.    Plaintiff re-alleges, as though fully set forth herein, the factual allegations in paragraphs 1 through 104 set forth above.

106.    Under the FEHA, it is unlawful "[f]or an employer,...because of...mental disability...[or] age...to harass an employee, an applicant, an unpaid intern or volunteer." Cal. Gov. Code § 12940(j)(1). Regulations interpreting the FEHA define "harassment" to include, inter alia, "Verbal harassment, e.g., epithets, derogatory comments or slurs." 2 Cal. Code of Regulations § 11019(b)(2)(A).

107.    Plaintiff belongs to a protected group because of his age and disability. Plaintiff was and is perceived to be over the age of 40; and, Plaintiff applied for education, training, and employment by Defendants for a fixed term of 4–7 years, during which Plaintiff would have reached his 40th birthday. Plaintiff suffers from a disability: auditory dyslexia.

108.    Plaintiff was subject to verbal harassment because of his age and disability. Employees and agents of Defendant made disparaging statements to Plaintiff and to third parties in connection with Plaintiff's perceived age and disability. Those same employees and agents had discretion by virtue of their employment by Defendant to rank, select, or hire candidates for the positions that Plaintiff applied for. Therefore, the harassing statements altered the conditions of Plaintiff's pending and future applications with Defendant and with other institutions.

109.     As a direct result of the acts and conduct of Defendants as alleged herein,

1   Plaintiff has suffered a loss of earnings and related benefits in an amount to be proven at trial

2   herein.

3         110.    As a direct and proximate result of the willful, knowing, harassment, Plaintiff has

4   suffered depression, mental distress, anguish, and indignation. He is thereby entitled to general

5   and compensatory damages in an amount to be proven at trial.

6         111.    The conduct of Defendants described herein above was outrageous and was

7   executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights,

8   and further, with the intent, design and purpose of injuring Plaintiff.

9         112.    Defendants committed the acts alleged herein by acting knowingly and willfully,

10  with the wrongful and illegal deliberate intention of injuring Plaintiff, from improper motives

11  amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to

12  recover nominal, actual, and compensatory damages an attorneys' fees in amounts according to

13  proof at time of trial, in addition to any other remedies and damages allowable by law.

14        113.    As pleaded above, Plaintiff has duly exhausted his administrative remedies.

15  WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

16  **FIFTH CLAIM**

17  <u>Retaliation in Violation of the FEHA</u>

18  (Alleged Against Defendant Regents and Does 1-5)

19        114.    Plaintiff re-alleges, as though fully set forth herein, the factual allegations in

20  paragraphs 1 through 113 set forth above.

21        115.    Under the FEHA, it is unlawful "[f]or any employer...to discharge, expel, or

22  otherwise discriminate against any person because the person has opposed any practices

23  forbidden under this part or because the person has filed a complaint, testified, or assisted in any

24  proceeding under this part." Cal. Gov. Code § 12940(h).

25        116.    Plaintiff engaged in protected activity, to wit, making internal and external

26  complaints regarding violations of the FEHA, including discrimination and harassment.

27        117.    The individuals responsible for the decision-making regarding residency and

28  other factors at UCSF knew of Plaintiff's protected activities.

22

Plaintiff's First Amended Complaint for Damages and Injunctive Relief
*Dr. Jordan Spatz v. Regents, et al.*                    3:21-CV-09605-LB

118.    Plaintiff suffered adverse actions as set forth above.

119.    The adverse actions occurred in close temporal proximity to Plaintiff's complaints, and to the investigations surrounding those complaints performed by the University's Office for the Prevention of Harassment and Discrimination and the University of California Office of the President.

120.    Plaintiff's protected activities were a substantial motivating factor in the decisions to not select him for residency via Match and SOAP, and the other adverse actions set forth above.

121.    As a direct result of the acts and conduct of Defendants as alleged herein, Plaintiff has suffered a loss of earnings and related employment benefits in an amount to be proven at trial herein.

122.    As a direct and proximate result of the willful, knowing, retaliation, Plaintiff has suffered depression, mental distress, anguish, and indignation. He is thereby entitled to general and compensatory damages in an amount to be proven at trial.

123.    The conduct of Defendants described herein above was outrageous and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff.

124.    Defendants committed the acts alleged herein by acting knowingly and willfully, with the wrongful and illegal deliberate intention of injuring Plaintiff, from improper motives amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover nominal, actual, and compensatory damages an attorneys' fees in amounts according to proof at time of trial, in addition to any other remedies and damages allowable by law.

125.    As pleaded above, Plaintiff has duly exhausted his administrative remedies.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

//

## SIXTH CLAIM

<u>Failure to Prevent Discrimination and Retaliation</u>

(Alleged Against Defendant Regents and Does 1-5)

126.     Plaintiff re-alleges, as though fully set forth herein, the factual allegations in paragraphs 1 through 125 set forth above.

127.     Under the FEHA, it is unlawful "[f]or an employer...to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Cal. Gov. Code 12940(k).

128.     Plaintiff utilized available complaint procedures to alert Defendants of the discrimination and harassment. In many instances, Plaintiff was encouraged not to use, or to delay the use of, Defendants' complaint procedures.

129.     Defendants have failed to take all reasonable steps necessary to prevent discrimination and retaliation against Plaintiff.

130.     Defendants have violated their own internal policies in failing to prevent discrimination and retaliation.

131.     As a direct result of the acts and conduct of Defendants as alleged herein, Plaintiff has suffered a loss of earnings and related employment benefits in an amount to be proven at trial herein.

132.     As a direct and proximate result of the willful, knowing, retaliation, Plaintiff has suffered depression, mental distress, anguish, and indignation. He is thereby entitled to general and compensatory damages in an amount to be proven at trial.

133.     The conduct of Defendants described herein above was outrageous and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff.

134.     Defendants committed the acts alleged herein by acting knowingly and willfully, with the wrongful and illegal deliberate intention of injuring Plaintiff, from improper motives amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover nominal, actual, and compensatory damages an attorneys' fees in amounts according to proof at time of trial, in addition to any other remedies and damages allowable by law.

135.     As pleaded above, Plaintiff has duly exhausted his administrative remedies.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

**SEVENTH CLAIM**

Whistleblower Retaliation in Violation of Health & Safety Code § 1278.5

(Alleged Against Defendant Regents and Does 1-10)

136.    Plaintiff re-alleges, as though fully set forth herein, the factual allegations in paragraphs 1 through 135 set forth above.

137.    California Health & Safety Code § 1278.5 prohibits discrimination or retaliation against a "employee, member of the medical staff, or other health care worker" of a health facility because that person either "presented a grievance, complaint, or report" or "initiated, participated, or cooperated in an investigation or administrative proceeding related to the quality of care, services, or conditions at the facility..."

138.    Defendants retaliated against Plaintiff because he reported to superiors regarding unsafe patient practices arising from resident scheduling in violation of ACGME Duty Hour Limits. Plaintiff's reports were made using UCSF's available complaint procedures.

139.    As alleged above, because of Plaintiff's reports relating to unsafe patient practices, Defendants retaliated against Plaintiff by failing to educate, rank, select, or hire Plaintiff. Defendants also retaliated by making representations about Plaintiff's reports to third parties for the purpose of eliminating his ability to be educated, ranked, selected, or hired within the SPECIALIZATION 1 field.

140.    As a direct result of the acts and conduct of Defendants as alleged herein, Plaintiff has suffered a loss of earnings and related benefits in an amount to be proven at trial herein.

141.    As a direct and proximate result of the willful, knowing, retaliation, Plaintiff has suffered depression, mental distress, anguish, and indignation. He is thereby entitled to general and compensatory damages in an amount to be proven at trial.

142.    Defendants committed the acts alleged herein by acting knowingly and willfully, with the wrongful and illegal deliberate intention of injuring Plaintiff, from improper motives amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover nominal, actual, and compensatory damages an attorneys' fees in amounts according to proof at time of trial, in addition to any other remedies and damages allowable by law.

143.     As pleaded above, Plaintiff has duly exhausted his administrative remedies. WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

As to the First Claim for Violation of the Age Discrimination Act of 1975:

1.     For a mandatory injunction, requiring Defendants to take affirmative steps to root out and remedy the pattern and practice of discriminatory, retaliatory, and harassing behavior, including an audit, retraining, and discipline where warranted, supervised by a court-appointed special master or other process, at the Defendants' expense;

2.     For a mandatory injunction, requiring Defendants to enter Plaintiff into a resident position at UCSF Neurological Surgery residency program or comparable University of California Neurological Surgery residency program commensurate with Plaintiff's experience;

3.     For a mandatory injunction, requiring Defendants to enter with the Accreditation Council for Graduate Medical Education months of elective time credit for Plaintiff equal to, but not exceeding 30, Plaintiff's lost residency and employment time resulting from Defendant's discrimination, retaliation, and harassment;

4.     For reasonable attorneys' fees as provided by law;

5.     For costs of suit herein; and

6.     For such other and further relief as the Court deems fair and just.

As to the Second through Seventh Claims:

7.     For a mandatory injunction, requiring Defendants to take affirmative steps to root out and remedy the pattern and practice of discriminatory, retaliatory, and harassing behavior, including an audit, retraining, and discipline where warranted, supervised by a court-appointed special master or other process, at the Defendants' expense;

8.     For a mandatory injunction, requiring Defendants to enter Plaintiff into a resident position at UCSF Neurological Surgery residency program or comparable University of

California Neurological Surgery residency program commensurate with Plaintiff's experience;

9.     For a mandatory injunction, requiring Defendants to enter with the Accreditation Council for Graduate Medical Education months of elective time credit for Plaintiff equal to, but not exceeding 30, Plaintiff's lost residency and employment time resulting from Defendant's discrimination, retaliation, and harassment;

10.    For general and compensatory damages in amounts according to proof and in no event in an amount less than the jurisdictional limit of this Court;

11.    For special damages in amounts according to proof;

12.    For punitive and exemplary damages against individual defendants only, to deter future unlawful conduct,

13.    For reasonable attorneys' fees as provided by law;

14.    For interest as provided by law;

15.    For costs of suit herein; and

16.    For such other and further relief as the Court deems fair and just.


Dated: April 7, 2022                          FORTHRIGHT LAW, P.C.


                                              ___/s/ Dow W. Patten____
                                              Dow. W. Patten
                                              Gregory M. Saavedra
                                              Attorneys for Plaintiff
                                              Dr. Jordan Spatz, M.D., Ph.D.



//

Plaintiff's First Amended Complaint for Damages and Injunctive Relief

*Dr. Jordan Spatz v. Regents, et al.*                                          3:21-CV-09605-LB

1

2

## JURY DEMAND

3

Plaintiff hereby demands trial by jury of all matters so triable.

4

5

Dated: April 7, 2022                                    FORTHRIGHT LAW, P.C.

6

                                                            _/s/ Dow W. Patten_

7

                                                        Dow. W. Patten

8

                                                        Gregory M. Saavedra
                                                        Attorneys for Plaintiff

9

                                                        Dr. Jordan Spatz, M.D., Ph.D.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff's First Amended Complaint for Damages and Injunctive Relief

*Dr. Jordan Spatz v. Regents, et al.*                                    3:21-CV-09605-LB